Jonathan D. Lupkin (JL 0792)
Michael B. Smith (MS 3281)
**LUPKIN & ASSOCIATES PLLC**
26 Broadway, 19th Floor
New York, NY  10004
Tel: (646) 367-2771
Fax: (646) 219-4870
jlupkin@lupkinassociates.com
msmith@lupkinassociates.com
*Attorneys for Western New York Public Broadcasting Association*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RRKIDZ, INC., *a Delaware Corporation*, | Case No. 16-cv-00912 |
| Plaintiff, | |
| *v.* | **ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF DEFENDANT WESTERN NEW YORK PUBLIC BROADCASTING ASSOCIATION** |
| WESTERN NEW YORK PUBLIC BROADCASTING ASSOCIATION, *a New York Corporation*, | |
| Defendant. | |
| WESTERN NEW YORK PUBLIC BROADCASTING ASSOCIATION, | |
| Counterclaim Plaintiff, | |
| *v.* | |
| RRKIDZ, INC., | |
| Counterclaim Defendant. | |

Defendant-counterclaim plaintiff Western New York Public Broadcasting Association ("WNED"), by its undersigned attorneys, hereby submits the following Answer, Affirmative Defenses, and Counterclaims in response to the Complaint ("Complaint") of plaintiff-counterclaim defendant RRKidz, Inc. ("RRKidz").

## ANSWER

1.      WNED respectfully refers the Court to the license agreement between the parties for the content and legal effect thereof, and otherwise denies the allegations in paragraph 1.

2.      WNED admits that it sent a termination notice to RRKidz on August 7, 2015 and respectfully refers the Court to that termination notice for the content and legal effect thereof. WNED otherwise denies the allegations in paragraph 2.

3.      WNED respectfully refers the Court to RRKidz's August 12, 2015 letter to WNED for the content and legal effect thereof, and otherwise denies the allegations in paragraph 3.

4.      Denied, except admitted that WNED did not withdraw its termination notice.

5.      Admitted.

6.      Denied, except admitted that WNED is a New York not-for-profit organization with its principal place of business at 140 Lower Terrace Street, Buffalo, New York 14202.

7.      Admitted

8.      Paragraph 8 contains legal conclusions as to which no response is required. To the extent a response is required, the allegations are denied.

9.      Admitted.

10.      WNED repeats and re-alleges the contents of paragraphs 1-9 of this Answer as though fully set forth herein.

11.      Paragraph 11 contains legal conclusions as to which no response is required. To the extent a response is required, the allegations are denied.

12.      Paragraph 12 contains legal conclusions as to which no response is required. To the extent a response is required, the allegations are denied.

13.     WNED respectfully refers the Court to the "WNED Termination Notice" for the contents and legal effect thereof, and otherwise denies the allegations in paragraph 13.

14.     Paragraph 14 contains legal conclusions as to which no response is required. To the extent a response is required, the allegations are denied.

15.     Paragraph 15 contains legal conclusions as to which no response is required. To the extent a response is required, the allegations are denied.

## AFFIRMATIVE DEFENSES

By alleging the Affirmative Defenses set forth below, WNED does not purport to alter the burden of proof and/or burden of going forward with evidence that otherwise exists with respect to any particular issue at law or in equity. Furthermore, all such defenses are pleaded in the alternative.  They do not constitute an admission that WNED has any liability under the Complaint, that RRKidz has suffered any loss or damage whatsoever, or that RRKidz is entitled to any relief whatsoever.

### First Affirmative Defense
### (Failure to State a Claim)

16.     RRKidz's claim for declaratory relief is barred, in whole or in part, because RRKidz has failed to allege sufficient facts to establish the existence of a specific justiciable controversy between RRKidz and WNED and because the Complaint otherwise fails to state a claim upon which relief may be granted.

**Second Affirmative Defense
(Inadequate Remedy)**

17.    RRKidz's claim for declaratory relief is barred, in whole or in part, because the judicial determinations RRKidz seeks would not fully or finally settle the controversy between the parties.

**Third Affirmative Defense
(Unclean Hands)**

18.    RRKidz's claim for declaratory relief is barred, in whole or in part, by the doctrine of unclean hands.

**Fourth Affirmative Defense
(*In Pari Delicto*)**

19.    RRKidz's claim for declaratory relief is barred, in whole or in part, by the doctrine of *in pari delicto*.

**Fifth Affirmative Defense
(Breach of Implied Covenant of
Good Faith and Fair Dealing)**

20.    RRKidz's claim for declaratory relief is barred, in whole or in part, because the judicial determinations RRKidz seeks arise out of RRKidz's willful breach of the implied covenant of good faith and fair dealing.

## <u>COUNTERCLAIMS</u>

WNED, by its undersigned attorneys, brings the following counterclaims against RRKidz, and in support thereof alleges the following based upon personal knowledge with

respect to its own acts and status, and upon information and belief with respect to all other matters.

**Nature of the Dispute**

1.      *Reading Rainbow* is one of the longest-running and best-loved children's television series, having aired on PBS for 26 years. The *raison d'être* of the series is to foster in children a life-long love of reading.

2.      WNED, the co-creator of the series, also owns the exclusive rights to *Reading Rainbow*, including the famous and distinctive registered trademarks READING RAINBOW and the *Reading Rainbow* logo (collectively, the "RR Marks").

*Figure 1 - The Reading Rainbow Logo*



3.      Over the last three decades, WNED has raised more than $45 million to develop and promote the *Reading Rainbow* brand. As a result of WNED's efforts, the RR Marks have become immediately recognizable symbols of the gold standard for educational programming and the encouragement and development of child literacy.

4.      Over the years, WNED has licensed the RR Marks to many companies for the development, production, marketing, and distribution of *Reading Rainbow*-branded products and services. Those licenses all impose strict obligations on the licensees regarding the use of the RR

Marks and require the licensees to make plain to consumers that WNED is the sole and exclusive owner of the RR Marks.

5.      In 2011, WNED granted such a license to RRKidz (the "Agreement").  In exchange for a modest royalty, RRKidz obtained exclusive rights to market and distribute pre-existing episodes of *Reading Rainbow* in digital media and to create and sell certain *Reading Rainbow*-branded merchandise.

6.      Not satisfied with being a "mere" licensee, or with WNED's generous grant of rights, RRKidz began illicitly and methodically to usurp for itself *de facto* ownership of the *Reading Rainbow* brand by engaging in conduct beyond the scope of its license and specifically prohibited by the Agreement; exercising rights it did not have (and did not pay for); and working to supplant WNED in the minds of individual and corporate consumers. Among other things, RRKidz:

   6.1.    intentionally omitted from its marketing materials the required identification of WNED as the owner and licensor of the RR Marks;

   6.2.    designed its marketing messaging to give consumers the false impression that RRKidz was the owner of the RR Marks—for example, by referring to RRKidz as "the home of Reading Rainbow";

   6.3.    used the RR Marks, without WNED's authorization, to raise over $6.5 million dollars in funding for its own operations;

   6.4.    falsely held itself out to Netflix and Jim Henson Productions as authorized to negotiate the production and distribution of a new *Reading Rainbow* series;

6.5.    concealed its negotiations with Netflix and Henson from WNED until they
were nearly concluded and prevented WNED from participating in the
negotiations once WNED learned of them, thereby killing the deal; and

6.6.    produced and exploited for its own benefit video productions the Agreement
specifically bared RRKidz from producing and exploiting.

7.    As described in greater detail below, RRKidz's conduct violated—and continues
to violate—(a) the Agreement; (b) section 43(a) of the Lanham Act; (c) section 32(1)(a) of the
Lanham Act; (d) section 349 of the New York General Business Law; (e) section 360 of the New
York General Business Law; (f) California Business & Professions Code § 17200; (g) California
Business & Professions Code § 17500; and (h) the implied covenant of good faith and fair
dealing. RRKidz also willfully, maliciously, and unlawfully interfered with WNED's business
relations.

## Parties

8.    WNED is a New York not-for-profit organization with its principal place of
business at Horizons Plaza, 140 Lower Terrace, Buffalo, New York. WNED is the co-creator of
*Reading Rainbow* and the sole owner of the RR Marks.

9.    RRKidz is a Delaware corporation with its principal place of business at 101 S.
First Street, Suite 204, Burbank, California. RRKidz was co-founded in 2011 by LeVar Burton
and Mark Wolfe. Mr. Burton is an actor well-known for, among other things, his role as the host
of *Reading Rainbow*. Mr. Wolfe is a producer, with credits in films including *Terminator 3*.
Neither Mr. Burton nor Mr. Wolfe own—nor have they ever owned—any rights to the RR
Marks.

**Jurisdiction and Venue**

10.     This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Lanham Act, 15 U.S.C. §§ 1501 *et seq.* Moreover, this counterclaim arises out of the same transaction or occurrence set forth in the Complaint. As such, it is a compulsory counterclaim under Fed. R. Civ. P. 13(a).

11.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over this matter under 28 U.S.C. § 1367.

**The RR Marks**

12.     WNED is the sole and exclusive owner of the RR Marks. Those marks are subject to the following registrations on the Principal Register in the United States Patent and Trademark Office:

| Trademark | Reg. No. | Reg. Date | Goods & Services | First Use |
|---|---|---|---|---|
| **READING RAINBOW** | 2332804 | Mar. 21, 2000 | Entertainment services, specifically creation and distribution of a television series | 1983 |
|  | 1611594 | Aug. 28, 1990 | Entertainment services, specifically the services of a television series | 1983 |
| **READING RAINBOW** | 4023167 | Sep. 6, 2011 | Streaming of audio and video material on the Internet; providing a Web site | 2011 |

| | | | that features streaming audio and video material on the Internet | |
| --- | --- | --- | --- | --- |
|  | 4023168 | Sep. 6, 2011 | Streaming of audio and video material on the Internet; providing a Web site that features streaming of audio and video material on the Internet | 2011 |
|  | 4901460 | Feb. 16, 2016 | Mugs & clothing | 2014 |
| **READING RAINBOW** | 4901463 | Feb. 16, 2016 | Mugs & clothing | 2014 |

13.     All of the above marks and registrations are valid and subsisting. Registration Nos. 1,611,594 and 2,332,804 have become incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.

### The RRKidz License

14.     In 2011, WNED and RRKidz entered into the Agreement, pursuant to which WNED granted to RRKidz the right to: (1) distribute pre-existing episodes of *Reading Rainbow*; and (2) use the RR Marks in connection with the creation and exploitation of *Reading Rainbow*-branded "goods, products and services" ("Ancillary Products").

15.     The Ancillary Products include the *Reading Rainbow* App, *Skybrary Family* (a subscription digital reading service that gives families access to a vast interactive digital library), *Skybrary School* (a similar service that includes lesson plans and other academically-oriented materials), t-shirts, mugs, bags, and other branded merchandise.

16.    Having entrusted RRKidz with rights to the RR Marks, WNED required RRKidz to preserve and protect the RR Marks, as well as WNED's ownership of them. RRKidz expressly acknowledges in the Agreement that WNED is the owner of the RR Marks and that RRKidz's use of the RR Marks is "for the benefit of WNED, RRKidz acquiring no interest in or rights in the Registered Marks by such use." §§ 9.a. & 9.g.; *see also* § 2.b., 7.c., 7.f., 7.l., 7.m., 7n., & 7.r.[1]

17.    To that end, the Agreement requires RRKidz to keep WNED apprised of its use of the RR Marks; to submit samples of such use; to consult with WNED regarding the design of websites featuring the RR Marks; to comply with WNED policies and guidelines and other restrictions on RRKidz's use of the RR Marks; and to consistently identify WNED as the licensor of the RR Marks in its messaging, sales and promotional material. *See, e.g.*, §§ 2.b., 7.a., 7.b., 7.d., 7.e., 7.g., 7.h., 7.j., 7.k., 7.p., 7.q., & 9.i.

18.    As described herein, RRKidz systematically ignored all of those obligations—and WNED's demands that it comply with them—in order to unjustly reap for itself, and at WNED's expense, the financial and reputational awards associated with the RR Marks.

## RRKidz's Marketing Materials Deliberately Deceive Consumers Regarding Ownership of the RR Marks

19.    RRKidz's extensive marketing campaign, which prominently features the RR Marks, includes multi-media dissemination of information to consumers on social media pages, in promotional emails, and on websites. RRKidz consistently fails to identify WNED as the owner and licensor of the RR Marks in those materials and deliberately misleads consumers into believing that RRKidz owns them.  Notably, RRKidz's conduct persists even after WNED specifically demanded that RRKidz cease its malfeasance. RRKidz also repeatedly has failed to

---

[1] Unless otherwise indicated, citations are to sections of the Agreement.

identify the *Reading Rainbow* mark as a registered mark, despite WNED's explicit instructions that trademark symbols be visible at all times when using the RR Marks.

### Social Media Pages

20.     In a letter dated March 24, 2015, WNED advised RRKidz that several members of the RRKidz team were referring to RRKidz as "the home of Reading Rainbow" on their social media pages, thus giving the misimpression that RRKidz owns *Reading Rainbow*. WNED instructed RRKidz to remove such references "from the LinkedIn pages, and all other web pages including biographical information, of RRKidz staff members." RRKidz ignored that request.

21.     As of March 8, 2016—almost a full year later—RRKidz's corporate LinkedIn page refers to RRKidz as the "home of *Reading Rainbow*" no fewer than four times. In one instance, RRKidz has misleadingly and unlawfully combined its own logo with WNED's *Reading Rainbow* logo to form the phrase "rrkidz – The Home of…Reading Rainbow."

*Figure 2 - Screenshot of https://www.linkedin.com/company/rrkidz on March 8, 2016*



22.     Similarly, the LinkedIn page of RRKidz CEO Mark Wolfe still refers to RRKidz as "the home of Reading Rainbow."

*Figure 3 - Screenshot of https://www.linkedin.com/in/markwolfe1 on March 8, 2016*



23.     Wolfe's Twitter and Instagram pages give the same false impression. The largest and topmost element on Wolfe's Twitter page is a cropped version of the *Reading Rainbow* logo, without any attribution to WNED, or even an indication that the mark is registered. Wolfe's Facebook page does not just give the "impression" that RRKidz owns *Reading Rainbow*, it explicitly says so: "LeVar and I bought bought [*sic*] Reading Rainbow…."  It further lists Wolfe as "Co-Founder/CEO" directly under the *Reading Rainbow* name, wrongly implying that he is the co-founder of *Reading Rainbow.*

*Figure 4 - Screenshot of https://www.facebook.com/Markmovies/about?section=education&pnref=about on March 8, 2016*

WORK



### Reading Rainbow
Co-Founder/CEO · 2011 to present · Burbank, California

LeVar and I bought bought Reading Rainbow two years ago and its been a crazy ride ever since. We are changing the world by working with hundreds of thousands of children to make reading FUN for them. So far, so good. 60,000 books a week are being read and 50,000 video field trips a week are being watched... with much more cool stuff to come.

24.     RRKidz, whose job is to promote WNED's RR Marks on the Internet, does not identify WNED on the *Reading Rainbow* Twitter, Tumblr, Instagram, or LinkedIn sites, or on the main page of the *Reading Rainbow* Facebook site. Printouts of the social media websites referenced herein, as they appeared on March 8, 2016, are attached hereto as **Exhibit A.**

25.     There is a single reference to WNED buried in the "About" page of the *Reading Rainbow* Facebook site. In order to find that reference, one must click through from the home page to the "About" page, and then click the "*See More*" link in the "Company Overview" section. Visitors who do not click the "*See More*" link are left with the misimpression that RRKidz is the sole owner of the RR Marks.

*Figure 5 - Screenshot of* https://www.facebook.com/readingrainbow/info/?tab=page_info *on March 8, 2016*



***Promotional Emails***

26.     WNED recently discovered that RRKidz has been sending promotional emails to parents, prominently featuring the RR Marks, without ever identifying WNED as the owner of the RR Marks.  Examples of such emails are attached hereto as **Exhibit B**.

27.     RRKidz never provided WNED with samples of the emails, or consulted with WNED regarding their content.

*Website*

28.     In or around October of 2014, WNED conducted a review of readingrainbow.com, which RRKidz maintains pursuant to the Agreement. In breach of its obligation to do so under section 2.b. of the Agreement, RRKidz had not consulted with WNED regarding the design of that website.

29.     During that review, WNED observed that RRKidz had not adequately identified WNED as the licensor of the RR Marks, and asked RRKidz to cure that breach of the Agreement. In response, RRKidz acknowledged that it needed to "clarify that WNED is the licensor," and informed WNED, for the first time, that it was in the process of making further changes to the website. Had WNED not affirmatively raised the issue, it is doubtful that RRKidz would have consulted WNED with respect to those changes, either.

*The App*

30.     The *Reading Rainbow* App is a centerpiece of WNED's digital distribution network. Through the App, parents and children can access *Skybrary* content, games, and other features designed to encourage reading and allow parents to chart their children's progress.

31.     The App is available for Apple iPad and Amazon Kindle Fire tablets. Apple and Amazon both provide a description and screenshots of the app, and information about the seller of the App, at the point of download. The listed seller is "RRKidz, Inc.," and at no time during the process of investigating or downloading the App would a consumer learn that the prominently featured RR Marks are owned and licensed to RRKidz by WNED.

32.     The first thing a user sees upon opening the App is a full-screen animation of the RRKidz logo, which transitions to the *Reading Rainbow* logo. There is no reference to WNED.

33.     Next, there is a video featuring LeVar Burton, in which he refers to "us at *Reading Rainbow*." That phrase can only be understood as a reference to RRKidz, the entity whose logo had just filled the screen.

34.     In fact, there does not appear to be any reference to WNED anywhere in the App.

### RRKidz Concealed, then Blocked, a Deal for a *Reading Rainbow* Netflix Series

35.     WNED expressly reserved for itself the right to produce or exploit new *Reading Rainbow* episodes. § 3. RRKidz has the *option* to acquire *from WNED* the right to produce or exploit new episodes. *See* §§ 3 & 15. RRKidz never had the right to unilaterally enter into negotiations with third parties for the production and exploitation of new episodes.

36.     Yet, in 2014 RRKidz—without WNED's knowledge—engaged in extensive negotiations with Netflix for the creation of a new *Reading Rainbow* series. Also without WNED's knowledge, RRKidz lined up The Jim Henson Company ("Henson") to produce the episodes, despite the fact that, under WNED's ownership and management, *Reading Rainbow* was awarded 26 Emmys, including ten for "Outstanding Children's Series."

37.     RRKidz first disclosed its negotiations with Netflix to WNED in late September 2014. RRKidz's CEO, Mark Wolfe, told WNED's CEO, Donald K. Boswell, that the discussions were "moving very fast" and that Netflix wanted to launch the first ten episodes by June 2015.

38.     Upon information and belief, RRKidz persuaded Netflix and Henson to pursue discussions with RRKidz by falsely representing that it had the authority to enter into such negotiations. RRKidz did not even purport to be negotiating the deal *on behalf of* WNED (something it still had no right to do without WNED's written approval). Rather, RRKidz was negotiating the deal *solely for itself*.

39.     Even after RRKidz disclosed the negotiations to WNED, it was clear that RRKidz was not "bringing the deal to" WNED. To the contrary, RRKidz worked hard to *prevent* WNED from becoming involved in the negotiations. Mr. Wolfe told Mr. Boswell that RRKidz would "keep moving th[e] deal forward," and that only after RRKidz and Netflix had reached a final agreement would RRKidz negotiate with WNED for the necessary rights.

40.     Mr. Boswell explained to Mr. Wolfe that, under the Agreement, "WNED has the rights to future episodes, and, therefore, we should be negotiating the deal with Netflix." Mr. Boswell nevertheless told Mr. Wolfe that RRKidz could continue its discussions with Netflix, provided that WNED be included in all conversations.

41.     Rather than involving WNED in the negotiations, RRKidz *stalled* the negotiations in an effort to pressure WNED into ceding its rights to RRKidz. Mr. Wolfe told Mr. Boswell that RRKidz was a "known entity" to Netflix, that the deal was almost done, and that "[t]o introduce any other part[ies] the negotiating entity would end this quickly as it would feel very confusing and murky and 'unlikely to get done'."

42.     Over the next two months, WNED repeatedly sought to persuade RRKidz to involve it in the negotiations. RRKidz repeatedly refused to do so.

43.     On or about November 24, 2014, RRKidz offered to "use good faith efforts to keep WNED *informed* during *significant* negotiations" with Netflix. WNED reminded RRKidz that this was inconsistent with the Agreement. Nevertheless, WNED proposed a "negotiation protocol" pursuant to which RRKidz could negotiate *on behalf of* WNED if, among other things, WNED was kept appropriately informed and consulted; had consent rights over all agreements; and would be signatory to those agreements.

44.     On December 15, 2014 RRKidz rejected that proposal and told WNED, for the first time, that the deadline for responding to Netflix's offer had expired three days earlier.

45.     But for RRKidz's failure to bring the Netflix deal to WNED initially, and its subsequent refusal to involve WNED in the negotiations with Netflix while at the same time holding up those negotiations for months, WNED could have successfully closed the deal with Netflix prior to the December 12, 2014 deadline.

46.     RRKidz's interference also diminished the goodwill and reputation WNED has worked so hard to develop, making potential business partners (and in particular Netflix and Henson) less likely to engage in discussions about new *Reading Rainbow* episodes in the future.

**RRKidz Raised $6.5 Million for Itself Through Unauthorized Use of
the RR Marks**

47.     Kickstarter is a digital "crowdfunding" platform where individuals or organizations can set up a webpage to solicit monetary contributions in exchange for various tiers of "rewards." For example, a musician looking to obtain financing to release her album could offer a copy of the completed album in exchange for a $10 donation; a signed copy for $20; bonus tracks for $50; a phone call with the artist for $100; lunch with the artist for $500, etc.

48.     In or around April of 2014, RRKidz approached WNED to explore the possibility of forming a separate nonprofit entity for the purpose of creating an app to be used in classrooms that would include original, tailored curricula and teacher resources.  RRKidz proposed launching a Kickstarter campaign to fund this endeavor to bring *Reading Rainbow* to classrooms.

49.     WNED asked RRKidz to present WNED with a business plan. When RRKidz failed to follow up, WNED assumed RRKidz had either abandoned the idea or proceeded in another direction.

50.     WNED subsequently learned that RRKidz had actually decided to go forward, without WNED, and—without WNED's knowledge or authorization—had launched the Kickstarter campaign under the *Reading Rainbow* name.

51.     The RR Marks are featured prominently on the Kickstarter page, yet despite RRKidz's obligation to "include identification of WNED as the licensor of Reading Rainbow and the Reading Rainbow logo in all adult-oriented informational messaging," **there is no mention of WNED *anywhere* on the Kickstarter page**. § 9.i. A printout of the Kickstarter webpage is attached hereto as **Exhibit C**.

52.     RRKidz has raised over $6.5 million through Kickstarter, while at the same time usurping for itself all the goodwill and reputational benefits that should have gone to WNED as the owner of the RR Marks, to say nothing of the millions of dollars RRKidz raised through its unauthorized and deceptive use of the RR Marks.

**RRKidz Is Monetizing Unauthorized Content**

53.     The Agreement expressly precludes RRKidz from producing or exploiting any "collection of pieces in which RR Intellectual Property is prominently featured, the total length of which is fifteen (15) minutes or more." § 3.d.i. The Agreement treats such collections as new *Reading Rainbow* episodes. § 3.a.

54.     In early 2015, WNED learned that RRKidz was creating and distributing collections of new audio-visual digital content prominently featuring the RR Marks on the *Reading Rainbow* YouTube channel.

55.     In a letter dated March 4, 2015, WNED expressed concern that RRKidz's production and exploitation of these collections was a violation of WNED's rights under section 3.d.i. of the Agreement.

56.     RRKidz assured WNED that none of the pieces was greater than 15 minutes in length. WNED's investigation revealed that the shorter pieces were being grouped into collections of greater than 15 minutes in total length.

57.     In a letter dated March 24, 2015, WNED advised RRKidz that its production and exploitation of these collections was a breach of the Agreement and instructed RRKidz not to make available any collections of longer than 15 minutes without WNED's prior written approval.

58.     Notwithstanding WNED's instructions, RRKidz is *still* streaming (and monetizing) *Reading Rainbow* "playlists" on the *Reading Rainbow* YouTube channel. Each playlist is a collection of between 6 and 32 similarly-themed videos that the viewer can watch continuously, without returning to the channel in between videos.  The total length of each playlist is greater than fifteen minutes.

*Figure 6 - Screenshot of https://www.youtube.com/user/readingrainbow/playlists on March 8, 2016*



59.     RRKidz pays WNED a modest 1% of its gross receipts in exchange for the rights granted in the Agreement. RRKidz's acquisition of any other or additional rights would necessarily be the subject of arm's-length negotiation between the parties. *See, e.g.,* § 3.d.(iii)(cc) (production of a collection of shorter pieces such as the playlists described above "would be considered to conflict with WNED's exclusive rights…and would require WNED's consent pursuant to terms to be negotiated in good faith"), 3.a. (granting RRKidz the right of first negotiation and last refusal to acquire from WNED the right to produce or exploit such content). Rather than negotiate with WNED at arm's length, as required by the Agreement, RRKidz simply arrogated to itself rights it did not have, without authorization and without compensating WNED.

60.     RRKidz has taken from WNED the right to control and profit from the launch and distribution of new episodes. Having made new long-form content available to consumers for free, RRKidz has severely constrained, if not entirely eliminated, WNED's ability to charge for similar content packages. Likewise, WNED can no longer offer a licensee the ability to be the first or only distributor of such content.

61.     RRKidz's unauthorized exploitation of these collections, along with its Kickstarter campaign and the Netflix debacle, all are examples of RRKidz's repeated attempts to exercise exclusive rights owned by WNED without authorization from, or appropriate consideration paid to, WNED.

**The Termination Notice**

62.     In a letter dated August 7, 2015, WNED provided RRKidz with notice, pursuant to and in compliance with the notice provisions of section 17 of the Agreement (the "Termination Notice"). In the Termination Notice, WNED notified RRKidz that the latter was in material breach of its obligations under the Agreement. In the Termination Notice, WNED identified specific provisions that RRKidz had breached, and asserted facts giving rise to the breach and the cure sought by WNED.

63.     Among other things, WNED demanded that RRKidz remove from the Internet and all other distribution channels video collections with a total length of 15 minutes or more that feature the RR Marks; and desist from creating and distributing such video collections in the future. As demonstrated above, RRKidz has not complied with that demand.

64.     WNED also demanded an audit pursuant to section 13 of the Agreement. That audit revealed that RRKidz had significantly underreported its revenues in royalty statements it provided to WNED.

65.     Under section 8.a. of the Agreement, "[t]ermination will be effective 60 days after the other party's receipt of notice; provided, however, that, if the breach is susceptible to being cured, RRKidz will have 60 days after such notice is given in which to cure such to the reasonable satisfaction of WNED."

66.     Under existing ancillary agreements, the termination cure period expires on March 18, 2016.

**Count I**
**(Breach of Contract)**

67.      WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 66 of these counterclaims, as though fully set forth herein.

68.     WNED and RRKidz are parties to a valid and enforceable license agreement.

69.     WNED has fully performed under that agreement.

70.     RRKidz has repeatedly breached that agreement. Among other things:

70.1.    RRKidz breached sections 2, 4, 7, and 9 by using the RR Marks without WNED's authorization to raise $6.5 million for itself;

70.2.    RRKidz breached sections 7 and 9 of the Agreement by failing to consult with WNED regarding the design of the Kickstarter web page;

70.3.    RRKidz breached section 9 of the Agreement by failing to identify WNED as the licensor of the RR Marks in the Kickstarter campaign;

70.4.    RRKidz breached sections 7 and 9 of the Agreement by failing to consult with WNED regarding the design of the *Reading Rainbow* website;

70.5.    RRKidz breached section 9 of the Agreement by failing to make sufficiently clear on the *Reading Rainbow* website that WNED is the licensor of the RR Marks;

70.6.    RRKidz breached sections 7 and 9 of the Agreement by failing to consult with WNED regarding the content of promotional emails featuring the RR Marks;

70.7.   RRKidz breached section 9 of the Agreement by failing to identify WNED as the licensor of the RR Marks in promotional emails;

70.8.   RRKidz breached sections 7 and 9 of the Agreement by failing to consult with WNED regarding the content of social media pages featuring the RR Marks;

70.9.   RRKidz breached section 9 of the Agreement by failing to identify WNED as the licensor of the RR Marks in its social media pages;

70.10.  RRKidz breached sections 7 and 9 of the Agreement by including (and failing to remove when instructed) misleading statements on social media pages regarding the ownership of *Reading Rainbow*;

70.11.  RRKidz breached sections 3, 9, and 18 of the Agreement by unilaterally entering into secret negotiations for the production of new *Reading Rainbow* episodes, and then preventing WNED from participating in those negotiations;

70.12.  RRKidz breached section 3 of the Agreement by producing and exploiting collections of audio-visual pieces in which the RR Marks are prominently featured, the total length of which is fifteen minutes or more;

70.13.  RRKidz breached sections 7 and 9 of the Agreement by failing to use the registered trademark symbol in connection with its use of the RR Marks; and

70.14.  RRKidz breached section 4 of the Agreement by underreporting its revenues in quarterly royalty statements.

71.    RRKidz's conduct has caused, and continues to cause, substantial injury to WNED, for which WNED seeks monetary damages in an amount to be proven at trial.

72.     WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

73.     WNED further requests such other or additional relief as the Court may find just according to the circumstances of the case.

### Count II
### (Breach of Implied Covenant of
### Good Faith and Fair Dealing)

74.     WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 73 of these counterclaims, as though fully set forth herein.

75.     In the alternative, to the extent that RRKidz's conduct did not constitute a breach of the Agreement, it was a breach of the implied covenant of good faith and fair dealing.

76.     RRKidz's tortious and unauthorized conduct has caused, and continues to cause, substantial injury to WNED, for which WNED seeks monetary damages, the costs of the action together with WNED's reasonable attorneys' fees, and such other or additional relief as the Court may find just according to the circumstances of the case.

77.     WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

### Count III
### (Lanham Act § 43(a))

78.     WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 77 of these counterclaims, as though fully set forth herein.

79.     WNED has long used the RR Marks in interstate commerce in connection with the advertising, promotion, and distribution of *Reading Rainbow* and associated products and services.

80.     RRKidz, as WNED's licensee, is well aware of WNED's exclusive ownership of the RR Marks.

81.     RRKidz has violated 15 U.S.C. § 1125(a) in that it has used, and is using, the RR Marks in a manner not authorized by WNED that is likely to cause—and has caused—confusion, mistake or deception as to the origin of its goods, services, and commercial activities.

82.     RRKidz similarly has violated 15 U.S.C. § 1125(a) in that it has knowingly misrepresented the origin of its goods, services, and commercial activities in commercial advertising and promotion.

83.     RRKidz's unauthorized and tortious conduct has caused WNED to suffer commercial damage, as well as the loss of goodwill and reputation established by WNED in the RR Marks.

84.     WNED seeks recovery of RRKidz's profits, WNED's actual damages, and treble damages under 15 U.S.C. § 1117(a). Because RRKidz acted knowingly, deliberately, and willfully, this is an exceptional case under § 1117(a), entitling WNED to recover its reasonable attorneys' fees. WNED is separately entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

85.     WNED also seeks an injunction under 15 U.S.C. §1116(a) restraining and enjoining RRKidz and its agents, servants, and employees, and all persons acting thereunder, in concert therewith or on their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using the RR Marks without prominently identifying WNED as the licensor and owner of the RR Marks; and (c) engaging in substantive discussions with any third party regarding the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement) without WNED's prior written authorization.

**Count IV**
**(Lanham Act § 32(1)(a))**

86.     WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 85 of these counterclaims, as though fully set forth herein.

87.     RRKidz has violated 15 U.S.C. § 1114(1)(a) in that it has knowingly used, and continues to use, the RR Marks in commerce in connection with the sale, offering for sale, distribution, and advertising of goods and services in a manner not authorized by WNED and likely to cause confusion, to cause mistake, and to deceive, including regarding WNED's ownership of and control over the RR Marks.

88.     RRKidz's unauthorized and tortious conduct has caused WNED to suffer commercial damage, as well as the loss of goodwill and reputation established by WNED in the RR Marks.

89.     WNED seeks recovery of RRKidz's profits, WNED's actual damages, and treble damages under § 1117(a). Because RRKidz acted knowingly, deliberately, and willfully, this is an exceptional case under 15 U.S.C. § 1117(a), entitling WNED to recover its reasonable attorneys' fees. WNED is separately entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

90.     WNED also seeks an injunction under 15 U.S.C. §1116(a) restraining and enjoining RRKidz and its agents, servants, and employees, and all persons acting thereunder, in concert therewith or on their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using the RR Marks without prominently identifying WNED as the licensor and owner of the RR Marks; and (c) engaging in substantive discussions with any third party regarding the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement) without WNED's prior written authorization.

## Count V
## (G.B.L. § 349)

91.     WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1

through 90 of these counterclaims, as though fully set forth herein.

92.     RRKidz's consumer-oriented marketing materials, including the *Reading*

*Rainbow* website, social media pages, promotional emails, and Kickstarter campaign, were and

continue to be materially misleading regarding the ownership of the RR Marks.

93.     As a result of RRKidz's deceptive acts and practices, which RRKidz undertook in

bad faith, WNED has suffered substantial commercial and reputational injury, for which WNED

seeks monetary damages, as well as injunctive relief restraining and enjoining RRKidz and its

agents, servants, and employees, and all persons acting thereunder, in concert therewith or on

their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using

the RR Marks without prominently identifying WNED as the licensor and owner of the RR

Marks; and (c) engaging in substantive discussions with any third party regarding the possible

production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement)

without WNED's prior written authorization.

94.     Because RRKidz acted knowingly, deliberately, and willfully, WNED also seeks

an award of treble damages and reasonable attorneys' fees under G.B.L. § 349(h). WNED is

separately entitled to reasonable attorneys' fees under section 18.e. of the Agreement because

this claim and controversy arises out of or relates to the Agreement.

## Count VI
## (G.B.L. § 360)

95.     WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1

through 94 of these counterclaims, as though fully set forth herein.

96.     RRKidz has violated New York General Business Law § 360-k in that it has knowingly used, and continues to use, the RR Marks in commerce in connection with the sale, offering for sale, distribution, and advertising of goods and services in a manner not authorized by WNED and likely to cause confusion, to cause mistake, and to deceive, including regarding WNED's ownership of and control over the RR Marks.

97.     As a result of RRKidz's deceptive acts and practices, which RRKidz undertook in bad faith, WNED has suffered substantial commercial and reputational injury, for which it seeks monetary damages, as well as injunctive relief under G.B.L. 360-l restraining and enjoining RRKidz and its agents, servants, and employees, and all persons acting thereunder, in concert therewith or on their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using the RR Marks without prominently identifying WNED as the licensor and owner of the RR Marks; and (c) engaging in substantive discussions with any third party regarding the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement) without WNED's prior written authorization.

98.     WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

99.     WNED further requests such other or additional relief as the Court may find just according to the circumstances of the case.

## Count VII
## (Cal. Bus. & Prof. Code § 17200)

100.     WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 99 of these counterclaims, as though fully set forth herein.

101.    RRKidz's conduct, as described herein, constitutes business acts and practices governed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* Those acts and practices were unlawful, unfair, and/or fraudulent.

102.    RRKidz also engaged in unfair, deceptive, untrue and/or misleading advertising, including acts prohibited by Cal. Bus. & Prof. Code §§ 17500 *et seq.*

103.    As a result of RRKidz's deceptive acts and practices, WNED has lost money and property, for which it seeks restitution, as well as injunctive relief under Cal. Bus. & Prof. Code § 17203 restraining and enjoining RRKidz and its agents, servants, and employees, and all persons acting thereunder, in concert therewith or on their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using the RR Marks without prominently identifying WNED as the licensor and owner of the RR Marks; and (c) engaging in substantive discussions with any third party regarding the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement) without WNED's prior written authorization.

104.    WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

105.    WNED further requests such other or additional relief as the Court may find just according to the circumstances of the case.

## Count VIII
### (Cal. Bus. & Prof. Code § 17500)

106.    WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 105 of these counterclaims, as though fully set forth herein.

107.    RRKidz made and disseminated, or caused to be made or disseminated, from the state of California to consumers in the state of California and other states, statements it knew or should have known to be untrue or misleading.

108.    RRKidz's conduct, as described herein, constitutes false advertising prohibited by Cal. Bus. & Prof. Code §§ 17500 *et seq.*

109.    As a result of RRKidz's continuing deceptive acts and practices, WNED has lost money and property, for which it seeks restitution, as well as injunctive relief under Cal. Bus. & Prof. Code § 17535 restraining and enjoining RRKidz and its agents, servants, and employees, and all persons acting thereunder, in concert therewith or on their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using the RR Marks without prominently identifying WNED as the licensor and owner of the RR Marks; and (c) engaging in substantive discussions with any third party regarding the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement) without WNED's prior written authorization.

110.    WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

111.    WNED further requests such other or additional relief as the Court may find just according to the circumstances of the case.

## Count IX
### (Tortious Interference With Prospective Economic Advantage)

112.    WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 111 of these counterclaims, as though fully set forth herein.

113.    WNED had a prospective business relationship with Netflix, in that Netflix desired to enter into an agreement with the owner of the rights to produce and exploit new *Reading Rainbow* episodes, and negotiated the terms of such an agreement to the point where entering into a contract was a "near certainty."

114.    RRKidz knew of that relationship and intentionally interfered with it by, among other things, concealing from WNED the offer and subsequent negotiations with Netflix; falsely representing to Netflix that RRKidz had the authority to negotiate and enter into an agreement for the production and exploitation of new episodes; preventing WNED from participating in the negotiations; and allowing the deal to fall through rather than permit WNED to negotiate directly with Netflix.

115.    RRKidz's intentional and tortious interference robbed WNED of the "near certain" opportunity to launch a new *Reading Rainbow* series with Netflix in 2015, which—in the words of RRKidz's CEO—would have "generate[d] extraordinary publicity and revenue opportunities…. Bottom line, a TV series means significant revenue and brand explosion for Reading Rainbow."

116.    A Netflix deal would have benefited both WNED and RRKidz. RRKidz killed the deal solely out of malice and used dishonest, unfair, and improper means to achieve its objectives.

117.    RRKidz's tortious and unauthorized conduct has caused, and continues to cause, substantial injury to WNED, for which WNED seeks monetary damages (including the lost opportunities for profits on the business RRKidz diverted), the costs of the action together with WNED's reasonable attorneys' fees, and such other or additional relief as the Court may find just according to the circumstances of the case.

118.    WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

**Count X**
**(Unjust Enrichment)**

119.    WNED hereby repeats and re-alleges the allegations set forth in paragraphs 1 through 118 of these counterclaims, as though fully set forth herein.

120.    RRKidz exercised rights belonging exclusively to WNED, which WNED did not authorize RRKidz to exercise, and for which RRKidz did not pay WNED any consideration.

121.    By its tortious and unauthorized conduct, RRKidz obtained benefits belonging to WNED, including the $6.5 million proceeds from the Kickstarter campaign; the profits from RRKidz's exploitation of video collections prohibited by the Agreement; and the reputation and goodwill associated with ownership of the RR Marks.

122.    RRKidz cannot, in fairness and good conscience, retain those benefits. Accordingly, the law requires RRKidz to return the money and compensate WNED for the unearned goodwill.

123.    WNED is entitled to reasonable attorneys' fees under section 18.e. of the Agreement because this claim and controversy arises out of or relates to the Agreement.

124.    WNED further requests such other or additional relief as the Court may find just according to the circumstances of the case.

**<u>JURY DEMAND</u>**

WNED hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, as to RRKidz's complaint for declaratory relief and WNED's counter-claims against RRKidz, WNED prays for entry of judgment against RRKidz and in favor of WNED as follows:

1.      Dismissing the Complaint in its entirety.

2.      Directing RRKidz to (a) prominently identify WNED as the owner and licensor of the RR Marks to all websites, communications, materials, and products that feature the RR Marks, unless to do so would be impossible or cost-prohibitive; (b) remove all new (*i.e.*, produced since the Agreement was executed) *Reading Rainbow* content over 15 minutes in length (including playlists or similar collections) from the *Reading Rainbow* YouTube channel and any other distribution channel use by RRKidz; (c)  instruct its employees and agents to remove, and to refrain from adding, anything on their personal or professional social media pages that would suggest that RRKidz or its founders own or control the RR Marks, specifically including any reference to RRKidz as "the home of *Reading Rainbow*"; and (d) immediately refer to WNED any third party interested in the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement).

3.      Restraining and enjoining RRKidz and its agents, servants, and employees, and all persons acting thereunder, in concert therewith or on their behalf, from (a) using the RR Marks without WNED's prior written authorization; (b) using the RR Marks without prominently identifying WNED as the licensor and owner of the RR Marks; and (c) engaging in substantive discussions with any third party regarding the possible production or exploitation of new *Reading Rainbow* episodes (as defined in the Agreement) without WNED's prior written authorization.

4.      Awarding WNED actual damages in an amount to be proven at trial but not less than $6.5 million excluding interest.

5.      Directing RRKidz to disgorge its profits from its unlawful, deceptive, and unauthorized use of the RR Marks.

6.      Awarding WNED punitive damages as permitted by statute.

7.      Awarding WNED its attorneys' fees and costs of suit.

8.      Awarding WNED such other and further relief as the Court deems just, equitable, and proper.

Dated:   New York, New York
             March 10, 2016

**LUPKIN & ASSOCIATES PLLC**

By:  */s/ Jonathan D. Lupkin*
        Jonathan D. Lupkin
        Michael B. Smith

26 Broadway, 19th Floor
New York, NY 10004
(646) 367-2771 (main)
(646) 219-4870 (fax)
jlupkin@lupkinassociates.com
msmith@lupkinassociates.com

*Attorneys for Western New York*
*Public Broadcasting Association*